UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:20 CR 98 HEA/JMB |
| DENIS J. MIKHLIN, | ) ) ) |
| Defendant. | ) |

### GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

**1. PARTIES:**

The parties are defendant **Denis J. Mikhlin** ("the Defendant"), represented by defense counsel **Gregory N. Smith,** and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

**2. GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the Defendant's voluntary plea of guilty to Counts 1, 19, 27, and 33 of the pending indictment, the Government agrees to move for the dismissal as to the Defendant of Counts 11 to 18, 20, 28 to 32, and 34 to 40 at the time of sentencing. Moreover, the United States agrees that no further federal criminal prosecutions will be brought in this District relative to the Defendant's (a) possession, use, purchase, sale, or distribution of illegal prescriptions or controlled substance medications obtained through the use of illegal prescriptions written by or containing the name

1

of any co-defendant, from 2014 to January 2020, (b) the submission of reimbursement claims for the above-described illegal prescriptions to health care benefit programs, and (c) the creation, use, and submission of documents, that he knew contained false and fraudulent information, to the Bank of Edwardsville in support of an application by Jerry Leech, D.C., for a mortgage loan in 2016, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties agree that the Government will not request an upward departure and the defendant will not request a downward departure from the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court. The parties further agree that the Defendant may request a downward variance from the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court, pursuant to Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

**3. ELEMENTS:**

As to **Count 1**, the Defendant admits to knowingly violating Title 18, United States Code, Section 371, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of conspiracy are:

*One*, two or more persons reached an agreement or came to an understanding to knowingly and intentionally possess with the intent to distribute a controlled substance;

*Two*, the Defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the Defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement or understanding knowingly did one or more overt acts for the purpose of carrying out or carrying forward the agreement or understanding.

As to **Count 19**, the Defendant admits to knowingly violating Title 21, United States Code, Section 843(a)(3), and admits there is a factual basis for the plea and further fully understands that the elements of the crime of acquiring or obtaining possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge are:

*One*, the Defendant acquired and obtained a controlled substance;

*Two*, the Defendant acted knowingly and intentionally; and

*Three*, the acquisition of the controlled substance was the result of misrepresentation, fraud, forgery, deception, or subterfuge.

As to **Count 27**, the Defendant admits to knowingly violating Title 42, United States Code, Section 1320a-7b(b)(1)(B), and admits there is a factual basis for the plea and further fully understands that the elements of the crime of soliciting and receiving illegal kickbacks for referrals are:

*One*, the Defendant solicited or received remuneration in return for referring an individual for an item or service;

*Two*, one purpose for which the remuneration was solicited or received was to induce or reward referrals for an item or service;

3

*Three*, the item or service was to be paid in whole or in part under a Federal health care program; and

*Four*, the Defendant knew that his conduct was wrongful.

As to **Count 33**, the Defendant admits to knowingly violating Title 18, United States Code, Section 1347, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of executing a health care fraud scheme are:

*One*, the Defendant knowingly devised or knowingly participated in a scheme or artifice to obtain money or property by means of false or fraudulent pretenses, representations, or promises;

*Two*, the pretenses, representations, or promises were material, that is, they would reasonably influence a person to part with money or property;

*Three*, the Defendant did so with the intent to defraud;

*Four*, the purpose of the scheme and artifice to defraud was to obtain money or property owned by or under the custody or control of a health benefit program; and

*Five*, the Medicare Program and the Missouri Medicaid Program are federal health benefit programs.

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

### Defendants

a. At all relevant times, the Defendant was a resident of St. Louis County, Missouri. Since in or about 2013, the Defendant has owned and operated one or more health care related businesses, including: Doctors on the Go, LLC; Doctors on the Go1, LLC (jointly referred to as

4

"DOTG"); and D. Mikhlin Enterprises, LLC.

    b.    At all relevant times, co-defendant Stanley L. Librach, M.D. ("Dr. Librach") was a medical doctor, licensed to practice medicine in the state of Missouri.

    c.    At all relevant times, co-defendant Asim Muhammad Ali, M.D. ("Dr. Ali") was a medical doctor, licensed in the state of Missouri. Since in or about February 2011, Dr. Ali has owned, operated, or been the medical director for one or more health care related businesses, including IPM, AMA Physician Group, LLC, and Central Diagnostic Laboratory ("CDL").

    d.    At all relevant times, co-defendant Jerry Dale Leech, D.C. ("Dr. Leech") was a doctor of chiropractic medicine, licensed to practice chiropractic medicine in the state of Missouri. Dr. Leech has never been licensed as a medical doctor or otherwise authorized to practice as a medical doctor in the United States.

    e.    At all relevant times, co-defendant Erin Herman ("Herman") was a resident of St. Louis County, Missouri.

    f.    At all relevant times, co-defendant Shaunta S. Crosby ("Crosby") was a resident of St. Louis County, Missouri and a Medicaid recipient.

    g.    At all relevant times, co-defendant Vladimir A. Kogan ("Kogan") was a resident of St. Louis County, Missouri.

    h.    At all relevant times, the Defendant, his co-defendants, and other unindicted co-conspirators worked together to obtain illegal prescriptions for controlled substance medications, including but not limited to oxycodone, for themselves and others, with the intent to sell or distribute the illegal prescriptions or the controlled substances. The Defendant knew the doctors, listed on the prescriptions as the prescribing doctors, did not have a doctor-patient relationship with the patients listed on the prescriptions and had not examined nor determined that the patients had a medical need for the controlled substance medications. The Defendant also knew

that pharmacies would submit reimbursement claims to Medicare and Medicaid for the medications obtained through the use of the illegal prescriptions.

### Relevant Medicare Provisions

i. The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings.

j. CMS acts through fiscal agents called Medicare Administrative Contractors ("MACs") which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern Missouri and thus processes reimbursement claims that Dr. Librach, Dr. Ali, CDL, API, IPM, and DOTG submit to Medicare.

k. To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

l. Medicare providers must retain clinical records for the period required by state law or five years from date of discharge if there is no requirement in state law.

m. Between 2012 and 2016, the Defendant and his co-defendants Dr. Librach, Dr.

6

Ali, and Dr. Leech, completed and signed Medicare enrollment applications, which contained Section 14, entitled "Penalties for Falsifying Information." Section 14 informed the applicant that he or she could be criminally prosecuted (a) for executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services.

      n.      The Medicare enrollment application for DOTG, which the Defendant completed and signed in or about August 2014, included the following "Certification Statement:"

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### Relevant Missouri Medicaid Provisions

      o.      MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

      p.      On about September 4, 2004, May 9, 2016, and December 20, 2013, respectively, co-defendants Dr. Stanley Librach, Dr. Asim Ali, Dr. Jerry Leech, and the Defendant signed Missouri Medicaid provider agreements, which contained the following promises: "I will comply with the Medicaid manual, bulletins, rules, and regulations as required by the Division of Medical Services and the United State Department of Health and

Human Services in the delivery of services and merchandise and in submitting claims for payment."

### Relevant Provisions Concerning Controlled Substance

q. Certain prescriptions drugs are defined by federal and state law as controlled substances, which are drugs that have some potential for abuse or dependence. Controlled substances are placed into one of five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug. Of the controlled drugs that can legally be prescribed, Schedule II drugs have the highest potential for abuse because of the risks of severe psychological or physical dependence. Oxycodone, hydrocodone, methadone, morphine, hydromorphone, oxymorphone, fentanyl, and amphetamines are Schedule II drugs.

r. Federal regulation, 21 CFR 1306.04(a), provides that:

> a prescription drug for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing of a controlled substances is upon the prescribing practitioner .... An order purporting to be a prescription issued in the usual course of professional practice ... is not a prescription within the meaning of section 309 of the Act (21 U.S.C. 829) and the person ... issuing the [purported prescription] shall be subject to the penalties provided for violations of the provision of law relating to controlled substances.

s. The Missouri Board of Registration for the Healing Arts ("Board") licenses and regulates medical doctors and certain other health care practitioners. The Board prohibits medical doctors from signing a blank prescription form or otherwise prescribing a "drug, controlled substance or other treatment" unless the doctor has established a physician-patient relationship and conducted a sufficient examination of the patients. See R.S. Mo. 334.100(2)(4).

### Description of the Conspiracy and Scheme

t. The Defendant admits he recruited individuals ("Recruits") to use fraudulent

8

prescriptions to obtain controlled substances. Most often, the fraudulent prescriptions were for oxycodone pills. The Recruits filled the prescriptions and gave the pills to the Defendant who paid the Recruits with pills, cash, or a combination of both. The Defendant admits he recruited co-defendants Herman, Kogan, and other un-indicted co-conspirators and paid them to fill fraudulent prescriptions.

Erin Herman

u.  The Defendant admits that he paid co-defendant Herman $300 to $350 for each fraudulent prescription that she filled. Per her agreement with the Defendant, Herman's name was used on the fraudulent prescriptions, which she filled on many occasions at Olive Street Pharmacy. The Defendant admits that on or about February 28, 2017, Herman caused two fraudulent prescriptions, one (#42061) for oxycodone Hcl 30 mg, 90 count tablets, and another one (#42062) for phentermine 37.5 mg, 30 count tablets, to be filled at Olive Street Pharmacy. "Erin Herman" was listed as the patient and Dr. Librach was listed as the prescribing doctor. The Defendant admits that he gave the prescriptions to Herman and knew Herman did not have a doctor patient relationship with Dr. Librach and did not have medical need for the controlled substances that she obtained with the fraudulent prescriptions.

Shaunta Crosby and Vladimir Kogan

v.  Co-defendant Crosby worked for the Defendant at DOTG in 2014 and again from in or about December 2017 to in or about June 2018. During this latter time-period, Crosby was the office manager and lead medical assistant for the doctors. Co-defendant Kogan, a friend and associate of the Defendant, was frequently at DOTG, when Crosby was also present.

w.  The Defendant admits he and co-defendants Crosby and Kogan recruited individuals whose names would be used on the fraudulent prescriptions and who would fill the fraudulent prescriptions for controlled substances. Dr. Librach or Doctor #1 would be listed as

9

the prescribing doctor, although the Defendant knew that neither Dr. Librach nor Doctor #1 had a doctor-patient relationship with the patients listed on the prescriptions and no doctor had determined that the patients needed the controlled substance medications.

x. The Defendant further admits that on many occasions he, or Crosby at his direction, provided fraudulent prescriptions for 30 mg oxycodone pills, 90 or 180 count, to co-defendant Kogan. On some occasions, Kogan filled the fraudulent prescriptions himself and gave all or some of the pills to the Defendant. On other occasions, Kogan sold the fraudulent prescriptions for $1,000 or more and shared the proceeds of the sales with the Defendant.

y. The Defendant admits that during an extended period in 2018, when he was incarcerated, he left Crosby in charge of DOTG and directed her to give numerous fraudulent prescriptions to co-defendant Kogan. Per their agreement, Kogan was to sell the fraudulent prescriptions and give the money received for the prescriptions to Crosby, who was directed to use the money to pay DOTG bills.

z. The Defendant admits he directed Crosby to create fake medical files for persons who were not legitimate patients of DOTG and who had never seen a DOTG doctor. These bogus medical files, containing patient profiles and copies of fraudulent prescriptions, were entered into Practice Fusion, a cloud-based electronic medical record system. The Defendant further admits he directed Crosby to tell pharmacies, calling to verify the prescriptions, that the prescriptions were valid and legitimate, when both knew the prescriptions were fraudulent. The Defendant gave Crosby lists of persons whose prescriptions she was to verify.

aa. On or about January 26, 2018, Shaunta Crosby caused a fraudulent prescription (#253420) for oxycodone/acetaminophen, 120 count tablets, to be filled at CVS Pharmacy in

Florissant, Missouri. "Shaunta Crosby" was listed as the patient and Dr. Librach was listed as the prescribing doctor.

Illegal Kickbacks from Central Diagnostic Laboratory ("CDL")

bb.     In or about June 2013, the Defendant opened Mikhlin Enterprises, which represents itself as a marketing company located in St. Louis, Missouri. Among other things, Mikhlin referred urine specimens to medical testing laboratories, which paid him or Mikhlin Enterprises for the referrals.

cc.     In or about August 2015, Dr. Ali incorporated and opened CDL, a medical laboratory located in St. Louis County, Missouri. Dr. Ali and two other persons jointly owned CDL, which, among other services, performed urine drug tests. In or about January 2016, Dr. Ali and other co-conspirators completed an application for CDL to participate in the Medicare Program. The application was approved and CDL became a Medicare provider.

dd.     The Defendant admits that he, Dr. Leech, other co-defendants, and other un-indicted conspirators agreed that CDL would pay Mikhlin Enterprises $35 for each urine specimen that the Institute for Pain Management ("IPM") and American Pain Management ("API") sent to CDL. The Defendant admits that he received a number of payments, disguised as marketing fees, in return for sending specimens to CDL, including a CDL check #2617, dated August 6, 2016, and payable to Mikhlin Enterprises for $8,260.00. The memo line of the check states: "Thank you! July marketing fees – 236 samples."

Amount of Controlled Substances

ee.     The parties stipulate that between in or about 2014 to in or about 2018, the Defendant and his co-defendants possessed, with the intent to distribute, the Schedule II, III, and

IV controlled substances as outlined in the chart below:

| Controlled Substance | Pills/Units | Equivalent KG of Marijuana |
|---|---|---|
| Oxycodone | 109,807 | 11,782 |
| Hydrocodone | 7,227 | 469 |
| Methadone | 2,771 | 9.1 |
| Morphine | 1,830 | 13.73 |
| Hydromorphone | 1,470 | 25.5 |
| Oxymorphone | 1,110 | 111 |
| Fentanyl | 655 | 0.06 |
| Amphetamines | 240 | 144 |
| Schedule III Drugs | 5,360 | 5.36 |
| Schedule IV Drugs | 10,153 | 0.64 |
| TOTAL | 130,470 | 12,561 |

ff. The amount of Schedule II, III and IV controlled substances attributable to the Defendant is not subject to precise calculation. However, based upon the available evidence, including medical records, Medicare and Medicaid claims data, and other records, the parties have agreed to hold the Defendant accountable for 2262.85 kilograms of marijuana which is the equivalent of the 12,120 oxycodone and phentermine pills that he personally possessed and distributed during the conspiracy period charged in the instant indictment.

## 5. STATUTORY PENALTIES:

The Defendant fully understands that the maximum possible penalty provided by law for the crime of conspiracy, as charged in **Count 1**, to which the Defendant is pleading guilty is imprisonment of not more than 5 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of obtaining controlled substances by fraud and deceit, as charged in **Count 19**, to which the Defendant is pleading guilty is imprisonment of not more than 4 years, a fine of not

12

more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 1 year.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of soliciting and receiving illegal remuneration for referrals of items and services paid by federal health care programs, as charged in **Count 27**, to which the Defendant is pleading guilty is imprisonment of not more than 10 years, a fine of not more than $100,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

The Defendant fully understands that the maximum possible penalty provided by law for the crime of executing a health care fraud scheme, as charged in **Count 33**, to which the Defendant is pleading guilty is imprisonment of not more than 10 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

### 6. U.S. SENTENCING GUIDELINES: 2018 MANUAL:

The Defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

a. **Chapter 2 Offense Conduct**:

(1) **Base Offense Level**: The parties agree that the base offense level for **Count 1** is 30 as found in Section 2D1.1 and 2X1.1; the base offense level for **Count 19** is 8 as found in Section 2D2.2; the base offense level for **Count 27** is 8 as found in Section 2B4.1; and the base offense level for **Count 33** is 6 as found in Section 2B1.1.

   **(2) Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

 The base offense level for **Count 27** should be increased by 10 levels, pursuant to Section 2B4.1(b) and Section 2B1.1(b)(1)(F), because the amount of the bribes exceeded $150,000, but did not exceed $250,000. The parties stipulate that the Defendant was paid $181,265 in bribes from 2014 to 2018 in return for his referrals of items and services reimbursed in whole or part by federal health care programs.

 The base offense level for **Count 33** should be increased by 14 levels, pursuant to Section 2B1.1(b)(1)(H), because the amount of the loss exceeded $550,000, but did not exceed $1,500,000. The offense level for Count 33 should be increased an additional 2 levels, pursuant to 2B1.1(b)(7) because the loss to Government health care programs exceeded $1,000,000. The parties stipulate that the loss to Government health care programs is $1,035,800.

 b. **Chapter 3 Adjustments:**

   **(1) Acceptance of Responsibility:** The parties agree that three levels should be deducted pursuant to Section 3E1.1(a) and (b), because the Defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the Defendant's intention to plead guilty. The parties agree that the Defendant's eligibility for this deduction is based upon information presently known. If, subsequent to the taking of the guilty plea, the Government receives new evidence of statements or conduct by the Defendant which it believes are inconsistent with Defendant's eligibility for this deduction, the Government may present said evidence to the Court, and argue that the Defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

   **(2) Other Adjustments:** The parties agree that the following additional

14

adjustments apply: The offense level for **Count 33** should be increased two levels, pursuant to Section 3B1.1(c), because the Defendant was a manager and supervisor of the criminal activity and increased an additional two levels, pursuant to Section 3B1.3, because he abused a position of public or private trust.

    c. **Other Adjustment(s)/Disputed Adjustments**: None

    d. **Estimated Total Offense Level**: The parties estimate that, before a reduction for acceptance of responsibility, the offense level for **Count 1** is 30; the offense level for **Count 19** is 8; the offense level for **Count 27** is 18, and the offense level for Count 33 is 26.

Pursuant to Sections 3D1.2, Counts 1, 27, and 33 constitute one group of closely related counts, with a highest offense level of 30. Count 19 is a separate group and pursuant to Sections 3D1.3 and 3D1.4, no additional levels are added because the offense level for this group is 9 or more levels less serious than the group with the highest offense level.

The parties estimate that the Total Offense Level is 27.

    e. **Criminal History**: The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the findings of the Presentence Report as to the Defendant's criminal history and the applicable category. The Defendant's criminal history is known to the Defendant and is substantially available in the Pretrial Services Report.

    f. **Effect of Parties' U.S. Sentencing Guidelines Analysis**: The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

7. <u>**WAIVER OF APPEAL AND POST-CONVICTION RIGHTS**</u>:

   **a. <u>Appeal</u>:** The Defendant has been fully apprised by defense counsel of the Defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

   **(1) <u>Non-Sentencing Issues</u>:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which Defendant is pleading guilty and whether the Defendant's conduct falls within the scope of the statute(s).

   **(2) <u>Sentencing Issues</u>:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the Defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea and the agreed Total Offense Level and sentences the Defendant within or above that range.

   **b. <u>Habeas Corpus</u>:** The Defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

   **c. <u>Right to Records</u>:** The Defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be

sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

    **a. Disclosures Required by the United States Probation Office:** The Defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

    **b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the Defendant.

    **c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the Defendant and may impose special conditions related to the crime Defendant committed. These conditions will be restrictions on the Defendant to which the Defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the Defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The Defendant understands that parole has been abolished

    **d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $400 which the Defendant agrees to pay at the time of sentencing. Money paid by the Defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

e. **Possibility of Detention:** The Defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

f. **Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The Defendant agrees to provide full restitution to all victims of all charges in the indictment.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the Defendant acknowledges, fully understands and hereby waives her rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the Defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The Defendant further understands that by this guilty plea, the Defendant expressly waives all the rights set forth in this paragraph.

The Defendant fully understands that the Defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of

18

the proceeding. The Defendant's counsel has explained these rights and the consequences of the waiver of these rights. The Defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The Defendant is fully satisfied with the representation received from defense counsel. The Defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the Defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact Defendant's immigration status or result in deportation. In particular, if any crime to which Defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the Defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the Defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the Defendant states that no person has, directly or indirectly, threatened or coerced the Defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The Defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The Defendant further acknowledges that this guilty plea is made of the D own free will and that the Defendant is, in fact, guilty.

19

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if the Defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the Defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

_August 21, 2020_
Date

_Dorothy L. McMurtry_
DOROTHY L. McMURTRY
Assistant United States Attorney

_8/20/20_
Date

DENIS J. MIKHLIN
Defendant

_8/20/20_
Date

GREGORY N. SMITH
Attorney for Defendant